IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DINAH JONES                           :          CIVIL ACTION
                                      :
            v.                        :
                                      :
KILOLO KIJAKAZI, Acting               :          NO.  20-5733
Commissioner of Social Security[1]    :

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                May 25, 2022

 Dinah Jones ("Plaintiff") seeks review of the Commissioner's decision denying

her application for supplemental security income ("SSI").  For the reasons that follow, I

conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by

substantial evidence and remand for further proceedings pursuant to sentence four of 42

U.S.C. § 405(g).

I. **PROCEDURAL HISTORY**

 Plaintiff protectively filed for SSI on February 28, 2018, alleging disability

beginning on January 1, 1997, as a result of bipolar disorder, depression, anxiety, obesity,

chronic obstructive pulmonary disease ("COPD"), asthma, carpal tunnel, and attention-

deficit hyperactivity disorder ("ADHD").  Tr. at 195, 220, 226.  Plaintiff's application

was denied initially, id. at 102-19, and Plaintiff requested a hearing before an ALJ, id. at

130-32, which took place on July 10, 2019.  Id. at 33-56.  On August 21, 2019, the ALJ

---

 [1]Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9,
2021, and should be substituted for Andrew Saul as the defendant in this action.  Fed. R.
Civ. P. 25(d).  No further action need be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

found that Plaintiff was not disabled.  Id. at 11-25.  The Appeals Council denied

Plaintiff's request for review on April 14, 2020, id. at 1-3, making the ALJ's August 21,

2019 decision the final decision of the Commissioner.  20 C.F.R. § 416.1472.

Plaintiff commenced this action in federal court on November 17, 2020, Doc. 1,

and the matter is now fully briefed and ripe for review.  Docs. 12, 17, 18.[2]

## II.  LEGAL STANDARDS

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.    Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.    If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.    If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the RFC to perform her past work; and

---

[2]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 6.

> 5. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 416.920(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether substantial evidence supports the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

## III. **DISCUSSION**

### A. **ALJ's Findings and Plaintiff's Claims**

The ALJ found that Plaintiff suffers from the severe impairments of asthma, obesity, bipolar disorder, adjustment disorder, depressive disorder, and post-traumatic stress disorder ("PTSD"). Tr. at 13. The ALJ next found that Plaintiff did not have an

3

impairment or combination of impairments that met the Listings, id. at 14, and that

Plaintiff retained the RFC to perform light work with the following limitations:

> [E]xcept lift and/or carry 20 pounds occasionally and 10
> pounds frequently; sit for six hours, stand for six hours,
> alternate to sitting for 10 minutes after every hour of standing,
> walking for six hours with alternating sitting for every hour of
> walking; push and/or pull as much as lift/carry; climb ramps
> and stairs occasionally; never climb ladders, ropes, or
> scaffolds; rarely (defined as less than occasionally but more
> than never) tolerate exposure to extreme cold[,] humidity and
> wetness, dust, fumes, pulmonary irritants; and occasionally
> tolerate exposure to extreme cold and extreme heat.
> [Plaintiff] can perform detailed, but uninvolved tasks
> (understand, remember, and carry out instructions), perform
> simple work related decisions (use judgment), can
> occasionally interact with supervisors, coworkers, and the
> public, and can tolerate occasional changes in a routine work
> setting (dealing with changes in a work setting).

Id. at 16-17.   Plaintiff had no past relevant work.   Id. at 23.   Based on the testimony of a

vocational expert ("VE"), the ALJ determined that there are jobs that exist in significant

numbers in the national economy that Plaintiff can perform, including sorter I, hand

bander, and garment bagger.   Id. at 23-24.   Thus, the ALJ found that Plaintiff was not

disabled.   Id. at 24.

Plaintiff claims that the ALJ erred in determining that Plaintiff was not disabled,

arguing that the ALJ (1) failed to properly weigh the medical opinion evidence, (2)

erroneously assessed Plaintiff's RFC, and (3) erred in his assessment of Plaintiff's

subjective complaints.   Docs. 12 & 18.   Defendant responds that the ALJ's decision is

consistent with the statutory and regulatory scheme for evaluating medical opinion

evidence and is supported by substantial evidence.   Doc. 17.

B.   **Summary of the Record**

Plaintiff was born on September 1, 1970, making her 47 years old at the time of her application, and 48 at the time of the ALJ's decision. <u>Tr.</u> at 36, 222. At the time of her application, Plaintiff reported being five feet four inches tall, and weighing 214 pounds. <u>Id.</u> at 226. She completed the tenth grade and has no specialized training. <u>Id.</u> at 227.[3] Although Plaintiff indicated that she worked in a factory warehouse from September 2008 through December 26, 2018, <u>see</u> <u>id.</u> at 228, 236, the ALJ found that she had no substantial gainful activity during 2018 and 2019 (<u>id.</u> at 13, 51) and that she did not have any past relevant work. <u>Id.</u> at 23.[4] She has a history of physical and mental health treatment, which will be summarized separately.

1.   <u>Physical Treatment</u>

On March 10, 2017, Plaintiff sought medical treatment at the Family Health Center. <u>Tr.</u> at 314. The medical provider noted that Plaintiff had served eight years in prison and was released on January 3, 2017. <u>Id.</u> Plaintiff complained of chronic and sharp left great toe pain radiating up her leg to the knee, rated as an eight on a ten-point scale, exacerbated by walking, and stated that she wanted to quit smoking. <u>Id.</u> Her

---

[3]At her administrative hearing, Plaintiff testified that she completed the ninth grade. <u>Tr.</u> at 37.

[4]Plaintiff told a consultative examiner in August 2018 that she had last worked in factory for a temp agency for two months in 2008. <u>Tr.</u> at 536. She also reported that she stopped working in late 2008 when she was incarcerated, and had only one job in the last fifteen years. <u>Id.</u> at 227, 228. Thus, it appears that the December 26, 2018 date Plaintiff provided for ending her factory warehouse job was a typographical error.

medical problems were listed as vitamin D deficiency, psoriasis, obesity, asthma, carpal tunnel, and hypertension.  Id. at 311, 314.

On February 23, 2018, Plaintiff treated with a nurse practitioner at Family Practice and Counseling Network ("FPCN") for cough, wheezing, and shortness of breath.  Tr. at 340.  Plaintiff's past medical history included allergies, asthma, COPD, psoriasis, hypertension, and hyperlipidemia.  Id.  Plaintiff was started on several medications, including Dulera, Ventolin, furosemide, Minipress, Klor-con, Naprosyn, Lisinopril, diphenhydramine, atorvastatin, aspirin, and acitretin, and she was encouraged to use her inhaler every four hours as prescribed and to take allergy medication.  Id. at 342.[5]

---

[5]Dulera (generic formoterol and mometasone) is a bronchodilator used to control and prevent symptoms of asthma.  See https://www.drugs.com/dulera.html (last visited Apr. 18, 2022).  Ventolin (generic albuterol) is a bronchodilator used to treat and prevent bronchospasm.  See https://www.drugs.com/ventolin.html (last visited Apr. 18, 2022).  Furosemide (brand name Lasix) is a diuretic used to treat edema (water retention).  See https://www.drugs.com/furosemide.html (last visited Apr. 18, 2022).  Minipress (generic prazosin) is used to treat hypertension.  See https://www.drugs.com/minipress.html (last visited Apr. 18, 2022).  Klor-con (generic potassium chloride) is used to prevent or treat low blood levels of potassium.  See https://www.drugs.com/klor-con.html (last visited Apr. 18, 2022).  Naprosyn (generic naproxen) is a nonsteroidal anti-inflammatory drug used to treat pain or inflammation.  See http://www.drugs.com/naprosyn.html (last visited Apr. 18, 2022).  Lisinopril is an ACE inhibitor used to treat high blood pressure, congestive heart failure, and to improve survival after a heart attack.  See http://www.drugs.com/lisinopril.html (last visited Apr. 18, 2022).  Diphenhydramine (marketed under various names, including Benadryl) is an antihistamine.  See http://www.drugs.com/diphenhydramine.html (last visited Apr. 18, 2022).  Atorvastatin (marketed as Lipitor) is a statin used to treat high cholesterol and to lower the risk of stroke, heart attack, or other heart complications in people with risk factors.  See http://www.drugs.com/atorvastatin.html (last visited Apr. 18, 2022).  Acitretin (marketed as Soriatane) is a retinoid used to treat psoriasis.  See http://www.drugs.com/acitretin.html (last visited Apr. 18, 2022).

On March 1, 2018, Plaintiff told her FPCN provider that she needed Ventolin daily due to wheezing and shortness of breath, which happens even at rest, including three or four times the day before.  Tr. at 332.  She also reported having a lot of stressors in her life and was tearful when talking about them.  Id.  Upon examination, Plaintiff exhibited course rhonchi in the upper lobes of her lungs and expiratory wheezing throughout, and was tearful and stressed.  Id. at 334.  The provider identified Plaintiff's problem as "COPD exacerbation" and prescribed a course of Prednisone[6] and continued use of Dulera and Ventolin.  Id.

Plaintiff returned to FPCN on March 17, 2018, with complaints of leg pain, numbness, and tingling.  Tr. at 326.  Shirlee Drayton-Brooks, M.D., diagnosed neuropathic pain, recommended a nerve conduction study, and prescribed medications. Id. at 328.

On May 30, 2018, Plaintiff reported bilateral ankle swelling lasting two weeks. Tr. at 474.  She was assessed with hypertension, asthma, bilateral peripheral edema, and bilateral leg pain.  Id. at 473.  The provider refilled Plaintiff's medications and referred her to a pulmonologist and cardiologist.  Id.

On July 20, 2018, pulmonologist David Baumgartner, M.D., evaluated Plaintiff at the Temple Lung Center Clinic, on referral from her primary care provider for further management of asthma and COPD.  Tr. at 459-63.  Plaintiff complained of shortness of

---

[6]Prednisone is a corticosteroid used as an anti-inflammatory or an immunosuppressant medication to treat allergic disorders, skin conditions, ulcerative colitis, arthritis, lupus, psoriasis, or breathing disorders.  See http://www.drugs.com/prednisone.html (last visited Apr. 18, 2022).

7

breath with exertion and while lying down, with more wheezing at night.  Tr. at 459.  She

reported that she could only walk half a block before getting short of breath, and that it

has been getting worse of the last couple of months and is exacerbated by smoking,

getting upset, perfumes, dust, pollen, and cleaning chemicals.  Id.  She smoked a pack of

cigarettes per day for about twenty years and reported that she now smokes a pack over

three -to- four days.  Id.  Dr. Baumgartner assessed Plaintiff with dyspnea,[7] stating

"clinical picture including allergies, multiple triggers, relatively young age more

consistent with asthma rather than COPD although COPD may certainly be present as

well," and also sleep disturbance, tobacco dependence, and allergic rhinitis.  Id. at 461-

62.  The doctor switched her from Dulera to Breo and added Singulair and Incruse for

triple daily inhaler therapy.  Id.[8]

On August 3, 2018, Plaintiff complained to her primary care provider of bilateral

leg swelling and shortness of breath.  Tr. at 470.  She reported improvement with Breo,

with decrease in nighttime awakenings.  Id.  The treatment provider diagnosed Plaintiff

with asthma, bilateral peripheral edema, hypertension, and bipolar/depression.  Id. at 469.

---

[7]Dyspnea is defined as breathlessness or shortness of breath.  Dorland's Illustrated Medication Dictionary, 32nd ed. 2012, at 582.

[8]Breo (or Breo Ellipta) (generic fluticasone and vilanterol) is a combination medicine used in adults with asthma of COPD to improve symptoms and prevent bronchospasm or asthma attacks.  See http://www.drugs.com/breo-ellipta.html (last visited Apr. 18, 2022).   Singulair (generic montelukast) is used to prevent asthma attacks and exercise-induced bronchospasm.  See http://www.drugs.com/singulair.html (last visited Apr. 18, 2022).  Incruse (or Incruse Ellipta) (generic umeclidinium) is used to prevent airflow obstruction and reduce flare-ups in adults with COPD.  See http://www.drugs.com/incruse-ellipta.html (last visited Apr. 18, 2022).

On August 20, 2018, cardiologist Sabrina Islam, M.D., assessed Plaintiff for complaints of dyspnea on exertion, episodes of sharp left-sided chest pain associated with blurry vision, palpitations, and diaphoresis, and worsening lower extremity edema. Tr. at 509-10. Upon examination, Plaintiff exhibited 1+ bilateral lower extremity edema. Id. at 513. Dr. Islam diagnosed Plaintiff with chest pain, COPD, edema, and obesity. Id. at 513-14.[9] The doctor continued Plaintiff's medications, including aspirin, Lipitor, Atenelol, Lisinopril, Lasix and BuSpar. Id. at 514.[10]

On August 28, 2018, Kevin Hollick, D.O, assessed Plaintiff's RFC based upon a review of medical records as part of the initial disability determination. Tr. at 110, 113-15. Dr. Hollick opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours and sit for six hours in an eight-hour workday; push and/or pull up to the lift/carry weight limitations; and avoid concentrated exposure to cold, vibration, fumes, odors, dusts, gases, and poor ventilation, and hazards such as machinery and heights. Id. at 113-14.

---

[9]During 2018, Plaintiff typically weighed 213 pounds and exhibited a body mass index ("BMI") of between 36 and 37 kg/m2. See, e.g., tr. at 473 (May 30, 2018), 461 (Jul. 20, 2018). There is note that she weighed 183 pounds in March 2018, but that is inconsistent with other evidence in the same time frame. Id. at 326, 331.

[10]Atenelol (brand name Tenormin) is a beta-blocker used to treat angina and hypertension. See http://www.drugs.com/atenelol.html (last visited Apr. 18, 2022). BuSpar (generic buspirone) is an anti-anxiety medicine. See http://drugs.com/buspar.html (last visited Apr. 18, 2022). As will be discussed in the next section, BuSpar was first prescribed by Plaintiff's psychiatrist in December 2017. Tr. at 370.

On May 7, 2019, Plaintiff went to Penn Emergency Medicine for bilateral left lower extremity swelling and shortness of breath.  Tr. at 674.  A review of symptoms included leg swelling, right greater than left, left sacroiliac ("SI") joint pain, and feelings of weakness and heaviness in her lower extremities.  Id. at 676.  She weighed 233 pounds and had a BMI of 39.99 kg/m2.  Id. at 677.  Upon examination, she was fully oriented and appeared in no distress, with a normal range of motion, normal heart rate and rhythm, and wheezing and edema.  Id.  Plaintiff's lab work was "unremarkable" with no active disease in the chest, and her symptoms improved with treatment.  Id. at 680, 681.  The hospital discharged Plaintiff the following day, with instructions including the use of an albuterol inhaler.  Id. at 683.

2.      Mental Health Treatment

On November 27, 2017, Plaintiff sought treatment at John F. Kennedy Memorial Hospital ("JFK") for bipolar disorder and adjustment disorder with depressed mood.  Tr. at 357-61.[11]  Plaintiff was referred by the staff of the halfway house where she lived due to symptoms/mood changes.  Id. at 357.  At that time, Plaintiff reported that her depression worsened while she was incarcerated and that approximately eight members of her family died, leaving her with a sense of powerlessness and unmanaged grief, with symptoms of anhedonia, helplessness, resentment/self-judgment, persistent worry, difficulty with attention/focus, and frequent crying, and that she copes with anger by compulsively buying socks and makeup.  Id.  On mental status examination ("MSE") at

---

[11]The JFK records appear at pages 355-86 and 544-634, some of which are duplicates.

her initial visit, Plaintiff appeared neat, with normal motor behavior, depressed mood, appropriate affect, normal speech, unremarkable though content, normal thought process and perception, was oriented x 3, and exhibited good memory, concentration/attention, judgment, and insight.  Id. at 359-60.  Plaintiff's history of medications included the mental health prescription drug Thorazine.  Id. at 358.[12]

Plaintiff was seen at JFK again on December 20, 2017, at which time Khadija Ola, M.D., of JFK performed a psychiatric evaluation of Plaintiff.  Tr. at 362-70.  Plaintiff reported behavior and anger issues since childhood, that she was incarcerated for nine years due to aggravated assault, and she felt depressed because she lost multiple family members while incarcerated, and that she felt overwhelmed and stressed.  Id. at 363.  She identified her symptoms as depressed mood and feeling overwhelmed, stressed and anxious, with irritability, fatigue, lack of motivation, hopelessness, feelings of guilt, low frustration tolerance, self-isolative behaviors, paranoia, and auditory hallucinations, stating "I hear negative voices most of the time."  Id.  On MSE, Plaintiff had neat appearance and was oriented x 3, with normal motor behavior, depressed mood, blunt affect, normal speech, thought content with delusions, normal though process and perception, and fair memory, judgment, and insight.  Id.  367-69.  Dr. Ola diagnosed Plaintiff with bipolar I disorder with psychotic features, most recent episode depressed,

---

[12]Thorazine (generic chlorpromazine) is used to treat psychotic disorders or manic-depression in adults.  See https://www.drugs.com/mtm/chlorpromazine.html.

and adjustment disorders with mixed anxiety and depressed mood.  Id. at 369.[13]  The doctor started Plaintiff on Topamax, Risperdal, and BuSpar.  Id. at 370.[14]

On January 17, 2018, Plaintiff treated at JFK with Buster Smith, M.D.  Tr. at 373-77.  Plaintiff stated that she experienced crying spells throughout the day for two weeks, along with more frequent nightmares of people getting hurt, insomnia, decreased appetite, reduced energy, and irritability.  Id. at 373.  She denied auditory or visual hallucinations.  Id.  Plaintiff's MSE revealed anxious and depressed mood and otherwise normal findings.  Id. at 374-76.  Dr. Smith prescribed Effexor and continued Topamax, Risperdal, and BuSpar.  Id. at 373.[15]

---

[13]The features of bipolar 1 disorder are a manic episode, "a distinct period during which there is an abnormally, persistently elevated, expansive, or irritable mood and persistently increased activity or energy that is present for most of the day, nearly every day, for a period of at least 1 week," accompanied by additional symptoms (inflated self-esteem, decreased need for sleep, more talkative, flight of ideas, distractibility, increase in goal-directed activity, or excessive involvement in activities that have a high potential for painful consequences), which may have been preceded by and may be followed by hypomanic or depressive episodes.  Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM-5"), at 123, 127.  Bipolar I disorder with psychotic features means that delusions or hallucinations are present.  Id. at 152.  The essential feature of adjustment disorders is "[t]he presence of emotional or behavioral symptoms in response to an identifiable stressor."  Id. at 287.

[14]Topamax (generic topiramate) is an anti-seizure medication used to prevent migraine headaches in adults.  See https://www.drugs.com/mtm/topamax.html (last visited Apr. 18, 2022).  Risperdal (generic risperidone) is anti-psychotic medication used to treat schizophrenia and symptoms of bipolar disorder.  See https://www.drugs.com/risperdal.html (last visited Apr. 18, 2022).

[15]Effexor (generic venlafaxine) is an anti-depressant used to treat major depressive disorder, generalized anxiety disorder, social anxiety disorder, and panic disorder.  See https://www.drugs.com/mtm/effexor.html (last visited Apr. 18, 2022).

During a follow-up with Dr. Smith on February 27, 2018, Plaintiff stated that she continued to live in a halfway house and that her twelve-year-old son had been abused while placed in a home during her incarceration. Tr. at 378.[16] Plaintiff reported irritability, insomnia, lack of energy and appetite, and racing thoughts, and stated that she took prazosin for nightmares of people dying. Id. Plaintiff's MSE revealed anxious and irritable mood and distractable concentration/attention. Id. at 379-81. Dr. Smith increased Plaintiff's dosage of Risperdal and continued Topamax, BuSpar, and prazosin. Id. at 378, 379.

On August 15, 2018, Plaintiff saw Amy Huang, M.D., at JFK. Tr. at 576-80. Plaintiff reported being angry and depressed because her son was abused in the home he was in, that she recently lost her sister, and that she was moody, had poor energy, multiple awakenings at night, and racing thoughts. Id. at 576. Her MSE revealed a depressed mood and otherwise normal findings. Id. at 577-79. Dr. Huang increased Plaintiff's dosages of BuSpar, Risperdal, and prazosin, and continued Effexor and Topamax. Id. at 576.

On August 23, 2018, Michael Schuman, Ph.D., performed a psychological consultative examination of Plaintiff. Tr. at 536-42. Plaintiff reported that she had lived in a halfway house since 2017 and received outpatient therapy at JFK every two weeks and medical management. Id. at 536. Dr. Schuman noted Plaintiff's complaints of difficulty sleeping, loss of appetite, dysphoric moods, crying spells, hopelessness, loss of

---

[16]Plaintiff has three children and she reported that they lived in foster care during her time in prison and the halfway or recovery house. Tr. at 581.

usual interest, irritability, psychomotor agitation, concentration difficulties, excessive apprehension, worry, restlessness, fear of being judged negatively in social situations, and panic attacks twice per week "which entail breathing difficulties for about 15 minutes triggered by overthinking." Id. at 537.  The doctor also noted manic symptoms, including inflated self-esteem, talkativeness, pressured speech, distractibility, psychomotor agitation, excessive involvement in pleasurable activities, mood swings, expansive mood, increased goal-directed activities, flight of ideas, and decreased need for sleep.  Id. Plaintiff had no thought disorder, while her cognitive symptoms consisted of short-term memory deficits and organizational difficulties.  Id.  On MSE, Plaintiff was cooperative, her manner of relating was fair, and she was tearful on a few occasions.  Id. at 538.  She exhibited flat affect, dysthymic to irritable mood, mildly impaired recent and remote memory, below average cognitive functioning, poor insight, and poor judgment.  Id. at 538-39.  The doctor diagnosed Plaintiff with bipolar I disorder and PTSD and assessed her prognosis as guarded.  Id. at 539.[17]

Dr. Schuman also completed a medical source statement of mental ability to do work-related activities.  Tr. at 541-43.  The doctor opined that Plaintiff has moderate limitations in her ability to understand and remember complex instructions and marked difficulty in her ability to carry out complex instructions or make judgments on complex work-related decisions.  Id. at 541.  She has moderate limitations in interacting

---

[17]The essential feature of PTSD is the development of characteristic symptoms following exposure to one or more traumatic events, as well as persistent avoidance of stimuli associated with the traumatic event(s).  DSM-5 at 274-75.

appropriately with the public, supervisors, and co-workers, and in her ability to respond appropriately to usual work situations and to changes in a routine work setting due to her bipolar disorder and PTSD. Id. at 542.

On September 18, 2018, Thomas Fink, Ph.D., evaluated Plaintiff's mental impairments and mental RFC as part of the initial disability determination. Tr. at 110-11, 115-17. Dr. Fink opined that Plaintiff was moderately limited in her ability to interact with others and concentrate, persist, or maintain pace, and mildly limited in her ability to understand, remember, and apply information, and adapt or manage herself. Id. at 111. The doctor further opined that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public, and that she was not significantly limited in other abilities and could meet the basic mental demands of simple tasks on a sustained basis. Id. at 116-17.

Plaintiff continued treatment at JFK. On October 15, 2018, she saw Kevin Huang, M.D., and reported that the increased dosages of her medications had helped, with more stable mood, improved sleep and no nightmares of flashbacks. Tr. at 581. She continued to live in a recovery house and was looking for housing, while her three children were in foster care. Id. Her MSE yielded normal results. Id. at 582-84. Two months later Dr. Smith performed a MSE in which Plaintiff exhibited an anxious and depressed mood and distractible attention/concentration. Id. at 588-90.

Plaintiff returned to Dr. Smith at JFK on March 25, 2019. Tr. at 593-97. She reported that an adult nephew had recently died, her fourteen-year-old son had been

abused and was in therapy, and she was stressed and more irritable.  Id. at 593.  She

stated that she sometimes thinks others are talking about her and has racing thoughts

during the day.  Id.  Her MSE exhibited irritable mood and distractable

concentration/attention.  Id. at 594-96.  Dr. Smith increased Plaintiff's dosage of

Risperdal and continued her Effexor, BuSpar, Topamax, and prazosin.  Id. at 593.

During another follow-up with Dr. Smith on May 20, 2019, Plaintiff reported a recent

hospital visit for shortness of breath and stated that her mood had been fair and that she

was less irritable.  Id. at 598.  Dr. Smith again characterized Plaintiff's

concentration/attention as distractable and continued her medication regimen.  Id. at 601,

598.

       On May 30, 2019, Dr. Smith completed a medical source statement of Plaintiff's

mental ability to perform work-related activities.  Tr. at 664-69.  Dr. Smith listed

Plaintiff's diagnoses as bipolar disorder type I with psychotic features, adjustment

disorder, mixed with anxiety and depressed mood, and alcohol use disorder, severe, in

early or sustained remission.  Id. at 664.  Dr. Smith opined that Plaintiff had poor/no

ability to relate to co-workers, deal with the public, interact with supervisors, deal with

work stresses, function independently, and maintain attention and concentration, and fair

ability to follow work rules and use judgment, explaining that she suffers from a mood

disorder and is irritable and stressed due to the abuse of her minor son.  Id. at 665.  The

doctor further opined that Plaintiff had poor/no ability to understand, remember, and

carry out complex or detailed instructions, and fair ability to understand, remember, and

carry out simple instructions, explaining that individuals with Plaintiff's mood disorder

and multiple psychological stressors can have difficulty focusing and retaining information.  Id. at 666.   Dr. Smith opined that Plaintiff had poor/no ability to relate predictably to social situations and demonstrate reliability, and fair ability to behave in an emotionally stable manner, explaining that Plaintiff's irritability impacts her ability to relate to others, "especially in stressful situations, i.e. work."  Id. at 667.  Dr. Smith noted that Plaintiff would decompensate in a work setting, that she would likely miss three or more days per month, that she had a significant limitation in her ability to complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and that she would often or frequently experience deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner.  Id. at 668.  The doctor also noted that Plaintiff's response to treatment has been fair and that she is on multiple psychotic medications, some of which can impact energy and concentration, and he assessed her prognosis as guarded.  Id. at 669.

### 3.    Hearing Testimony and Other Evidence

At the administrative hearing held on July 10, 2019, Plaintiff testified that she is unable to work because she cannot stand or walk for long or be around people.  Tr. at 37.  She stated that she had lived for a year at a recovery house, where she still lived with two roommates.  Id. at 39-40.  Her responsibilities at the recovery house included buying food from a supermarket, paying rent, keeping her space clean, and preparing food.  Id. at 40-41.  Plaintiff explained that her son comes "once in a while" to take her shopping, that her son pays the rent, and that a roommate helps her with laundry.  Id.  She took a bus

from the recovery house to the hearing.  Id. at 41.  Prior to the recovery house, Plaintiff was incarcerated for eight years and three months.  Id.

Plaintiff also travels by bus to her mental health appointments, which include JFK therapy visits once or twice per month and separate medication visits once per month. Tr. at 41.  She also attends group therapy four mornings per week as a recovering alcoholic and narcotics anonymous ("NA") meetings three nights per week.  Id. at 42. The group therapy and NA meetings were originally required, but she continues to go because she wants to do them.  Id.

Plaintiff testified that she stopped smoking two months prior to the hearing.  Tr. at 44.  The ALJ questioned Plaintiff's diagnosis of COPD, noting that one of the treating physicians said Plaintiff's condition is more like asthma than COPD, given her age, and that although a pulmonary function test had been ordered several times, actual test results were missing from the record.  Id. at 43, 45.  Plaintiff described two emergency room visits in the months immediately preceding the hearing, one in June 2019 for asthma that had her "wheezing real bad," id. at 37, and the other in May 2019 for an anxiety-induced episode that left her "gasping for breath."  Id. at 38, 39.

Plaintiff's counsel argued at the hearing that Plaintiff "always had problems with the anxiety and depression, which was exacerbated by the long time that she was in prison."  Tr. at 46.  Plaintiff answered in the affirmative when asked if she has difficulty getting out of the house or motivating herself, explaining "I don't like to get dressed, I don't like to leave the house, but I'm pushing myself to go to my groups because I get to talk about it in my groups."  Id. at 47-48.  She continued to take anti-psychotic

medication because she thinks people are talking about her and she reported hearing voices when she is in a room.  Id. at 48.  She has difficulty completing tasks but does not like having people constantly remind her to do something.  Id. at 48, 49.

Plaintiff's hearing testimony is largely consistent with her Function Reports and Supplemental Function Questionnaire.  Tr. at 243-58, 259-68, 269-70.[18]  She reported bad wheezing at night and uses two inhalers twice per day, id. at 244, 249, and that she cannot sleep through the night and wakes up screaming.  Id. at 262.  She reported that her pain began in 2008 caused by lifting heavy things, that she experiences shooting pain down her legs to her feet, a burning sensation in her left hand, and stinging pain in her lower back, and that she cannot stay in one spot for long.  Id. at 269.  She takes naproxen and hot showers to relieve her pain, but the medication does not help.  Id. at 270.  She prepares food daily, indicating that it is "fixed for me," and needs help with chores around the house because she gets tired and out of breath fast.  Id. at 245.  She goes outside every day, can use public transportation, and shops two times per month for two hours at a time.  Id. at 246, 247.  She can walk for half a block before needing to stop and can resume walking after ten minutes.  Id. at 248.  Plaintiff reported that she talks on the phone every other day and goes to church every other week.  Id. at 247.  She cannot be around people for long because "they begin to ag[]itate me," and indicated that her

---

[18]The record contains a Third Party Function Report apparently completed by Plaintiff in error, tr. at 243-58, followed by a Function Report and Supplemental Function Questionnaire.  Id. at 259-68, 269-70.  Because the Third Party Function Report and Function Report contain mostly the same information, citations will be to the first report that appears in the record, except where noted.

physical and mental conditions affect her ability to lift, stand, walk, talk, climb stairs, see, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others.  Id. at 248.  She can pay attention for five minutes, does not comprehend spoken instructions, and can get along with authority figures.  Id. at 248-49.  She cries when under stress and panics when there are changes in her routine.  Id. at 249.

A VE also testified at Plaintiff's administrative hearing.  Tr. at 51-55.  As noted, the ALJ found that Plaintiff had no prior relevant work.  Id. at 51.  The ALJ asked the VE to consider whether jobs existed for a person of Plaintiff's age and education who could perform light work, except that for every hour of walking or standing the person is able to sit for ten minutes, with occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds, occasional work around humidity and wetness, rarely work around dust, odors, fumes, and pulmonary irritants, and occasional work in extreme cold and extreme heat.  Id. at 51-52.  The person can also understand, remember, and carry out instructions to detailed but uninvolved tasks, use judgment limited to simple work-related decisions, occasionally interact with supervisors, coworkers, and the public, and occasionally tolerate changes in routine work setting.  Id. at 52.  The VE testified that such a person could perform jobs that existed in the national economy, including sorter I, hand bander, and garment bagger.  Id.   When the ALJ changed the hypothetical to limit the person to sedentary work, the ALJ identified table worker, sorter, and addresser as jobs that the person could perform.  Id. at 52-53.  In response to questions from counsel, adding that the person could only occasionally respond appropriately to usual work situations and interact appropriately with supervisors, the VE testified that "[i]t would be

borderline at best, and likely, that person wouldn't maintain employment."  Id. at 54.

Lastly, the VE testified that if the person had no ability to be reliable and predictable in

social situations due to irritability, and had an inability to deal with stress and exhibited

tearfulness, such a person would not be able to work.  Id. at 55.

      **C.**      **<u>Plaintiff's Claims</u>**

           1.      <u>Consideration of the Medical Opinion Evidence</u>

Plaintiff argues that the ALJ erred by finding the opinion of treating psychiatrist

Dr. Smith to be "not persuasive."  Doc. 12 at 6-10; Doc. 18 at 2-5.  Defendant counters

Plaintiff relies on the incorrect regulatory framework regarding medical opinion

evidence, and that in any event this aspect of the ALJ's opinion is supported by

substantial evidence.  Doc. 17 at 5-11.

Before addressing Plaintiff's challenge to the ALJ's consideration of the medical

evidence, I first clarify the regulatory scheme governing such consideration.  In her brief,

although Plaintiff cites to the applicable regulation, she refers to the "weight" given to

certain medical opinion evidence.  Doc. 12 at 6.  The applicable social security regulation

was revised to abandon the concept of evidentiary weight and now focuses on the

persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or
> prior administrative medical finding(s), including those from
> your medical sources.

20 C.F.R. § 416.920c(a).[19]  The regulation lists the factors to be utilized in considering medical opinions:  supportability, consistency, relationship including the length and purpose of the treatment relationship and frequency of examinations, specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program.  Id. § 416.920c(c).  The most important of these factors are supportability and consistency, and the regulation requires the ALJ to explain these factors, but does not require discussion of the others.  Id. § 416.920c(b)(2).  The regulation explains that "[t]he more relevant the medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinion . . . will be."  Id. § 416.920c(c)(1).  In addition, "[t]he more consistent a medical opinion . . .  is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion . . . will be."  Id. § 416.920c(c)(2).

Plaintiff argues that it was error to find Dr. Smith's opinion "not persuasive" because the doctor was Plaintiff's treating psychiatrist and his opinion was therefore entitled to "great weight" under Third Circuit caselaw, Doc. 12 at 7, and because he is a specialist whose opinions are supportable and consistent with the record, including with the opinions of consulting psychologist Dr. Schuman.  Id. at 8-9.  To the extent Plaintiff argues that the ALJ had to assign weight to an opinion based on cases decided under a

---

[19]The new regulation applies to cases filed on or after March 27, 2017.  20 C.F.R. § 416.920c(a).  Because Plaintiff filed her application on February 28, 2018, the revised regulation is applicable in this case.

prior regulatory scheme, she is in error.  As for the remainder of Plaintiff's argument, as

noted above, although the treatment relationship and specialization are two factors to

consider, the most important factors in analyzing the evidence are supportability and

consistency with the record.

In his decision, the ALJ stated the following about the medical opinion evidence:

> On May 30, 2019, Dr. Smith . . . indicated that [Plaintiff] has
> poor to no ability to relate[] to coworkers, deal with the
> public, interact with supervisors, deal with work stresses,
> function independently, maintain attention and concentration,
> understand, remember, and carry out complex instructions,
> understand, remember, and carry out detailed b[ut] not
> complex instructions, relate predictably in social situations,
> and demonstrate reliability; and fair ability to follow work
> rules, use judgment, and understand, remember, and carry out
> simple instructions, and behave in an emotionally stable
> manner.  Dr. Smith noted that [Plaintiff] would decompensate
> in a work setting, that she would likely miss three or more
> days of work per month, that she had a significant limitation
> in her ability to complete a normal workday and work week
> without interruptions from psychologically based symptoms
> and perform at a consistent pace without an unreasonable
> number and length of rest periods, and that [Plaintiff] would
> often or frequently experience deficiencies in concentration,
> persistence, or pace resulting in failure to complete tasks in a
> timely manner.
>
> This is not persuasive because this statement assesses poor to
> no ability to function in a number of areas including relating
> to others, dealing with the public, function independently, and
> maintain attention and concentration.  This is inconsistent
> with the record as a whole.  While the treatment records
> indicate issues with mood and some irritab[ilit]y, there was
> improvement with medication and with increased contact
> with her children.  In addition, [Plaintiff] is able to live with
> others in a recovery house, is able to follow the house rules,
> goes to church, and engages with friends/family.  She is also
> able to shop in stores for food and clothing and take public
> transportation.  This evidence indicates at least a fair ability to

23

engage with others.  In terms of maintaining concentration
and attention, [MSEs] in the record were unremarkable except
for depressed and anxious mood.  In addition, upon testing,
[Plaintiff's] attention and concentration were intact, and her
memory skills were only mildly impaired.  [Plaintiff] is also
able to perform light cleaning, do laundry, and manage her
money, and she spends her days reading, shopping, and going
to meetings.  These activities indicate at least a fair ability to
maintain concentration and attention.  [Plaintiff] is also able
to attend to her personal needs, and had a neat appearance at
her therapy sessions.  Therefore, the record supports no more
than moderate limitations in any area of health functioning.

In August 2018, Dr. Schuman indicated that [Plaintiff] was
markedly limited in her ability to carry out complex
instructions, make judgments on complex work-related
decisions and moderately limited in her ability to understand
and remember complex instructions, interact appropriately
with the public, supervisors, and coworkers, and respond
appropriately to usual work situations and changes in a
routine work setting.  This assessment is only partially
persuasive because as discussed and outlined above,
[Plaintiff] requires no more than moderate limitations in any
area of mental health functioning.

. . . .

In a Disability Determination Explanation dated September
2018, after reviewing the evidence of record, Dr. Fink
indicated that [Plaintiff] was moderately limited in her ability
to carry out detailed instructions, maintain attention and
concentration for extended periods, and interact appropriately
with the general public.  Dr. Fink noted that [Plaintiff] can
understand and follow simple instructions, remember
locations and work-like procedures, relate and communicate
well, travel in the community, attend scheduled appointments,
meet schedule demands, persist at simple tasks, make simple
decisions, maintain regular attendance and be punctual, and
ask simple questions and accept instructions.  This assessment
is persuasive because it is consistent with [Plaintiff's]
generally normal [MSEs] throughout the record, with her
treatment history, and with her activities of daily living.

Tr. at 22-23 (record citations omitted).

The ALJ correctly noted that most aspects of Plaintiff's MSEs were unremarkable and that she reported some improvement with certain medications.  Regarding activities of daily living, the ALJ also correctly noted that Plaintiff resided with others in a recovery house with rules, attended church and group meetings, took public transportation, could perform limited shopping and light chores, and was able to take care of her personal needs.  However, the ALJ's characterization of this evidence, and his conclusions as to how the evidence supports and is consistent with the medical opinion evidence, is not supported by substantial evidence.

First, in identifying aspects of Plaintiff's MSEs that reflected normal findings and mental stability, the ALJ disregarded record evidence that supports Dr. Smith's opinions. Plaintiff's symptoms of anhedonia, helplessness, resentment/self-judgment, persistent worry, difficulty with attention/focus, and frequent crying appeared repeatedly during treatment at JFK over the course of a year-and-a-half, along with social isolation, excessive sleep, irritability, and anger issues.  Tr. at 357 (11/27/17), 363 (12/20/17), 373 (1/17/18), 440 (2/27/18), 587 (12/27/18), 613 (1/17/19), 593 (3/25/19).  Contrary to the ALJ's statement that "[MSEs] in the record were unremarkable except for depressed and anxious mood," the MSE clinical findings included depressed, anxious and/or irritable mood, as well as blunt and/or tearful affect, distractable concentration/attention, and one reference to delusions -- findings which persisted despite therapy and various psychotropic medications.  Id. at 359 & 547 (11/27/17 – depressed mood), 367-68 (12/20/17 – depressed mood, blunt affect, delusions), 374 & 441 (1/17/18 – anxious and

depressed mood), 378 (2/27/18 – anxious and irritable mood, distractable

concentration/attention), 588-89 (12/27/18 – anxious and depressed mood, distractable

concentration/attention) 594-96 (3/25/19 – irritable mood, distractable

concentration/attention).  Therapy sessions focused on issues of bereavement, self-

isolation, worries over the treatment of her children while she was incarcerated, and

parenting and housing issues.  Dr. Smith's opinions regarding Plaintiff's mental health-

related limitations were premised on these findings, as the doctor explained in

considerable detail in his medical source statement.  For example, Dr. Smith explained

that individuals with a mood disorder and multiple psychological stressors can have

difficulty focusing and retaining information (id. at 666), that Plaintiff's irritability

impacts her ability to relate to others, "especially in stressful situations, i.e. work" (id. at

667), and that Plaintiff's medications can impact energy and concentration, including

Risperdal which "is necessary to control her psychosis."  Id. at 669.

Also, although the ALJ reviewed both Dr. Smith's and Dr. Schulman's assessment

and compared them to some evidence in the record, the ALJ did not appear to have

considered that the two reports are largely consistent, particularly regarding Plaintiff's

ability to interact with supervisors.  For example, as noted above, Dr. Smith opined that

Plaintiff has poor/no ability to relate to coworkers, deal with the public, interact with

supervisors, and deal with work stresses, and that she would likely decompensate in a

work setting.  Following his examination of Plaintiff, Dr. Schuman opined that Plaintiff

had marked limitations in her ability to carry out complex instructions and make

judgments on complex work-related decisions, and moderate limitations in interacting

appropriately with the public, supervisors, and coworkers, and in her ability to respond

appropriately to usual work situations and to changes in a routine work setting due to her

bipolar disorder and PTSD. Tr. at 542. While not identical, both doctors assessed

Plaintiff with significant limitations in her abilities to deal with coworkers, the public,

supervisors, and work changes/stresses -- limitations which are significant in light of the

VE's testimony that an individual who could only occasionally interact appropriately

with her supervisors would not be able to sustain employment. Id. at 54.

Second, the ALJ's conclusion that Plaintiff's activities are inconsistent with Dr.

Smith's opinions is a mischaracterization of the evidence. The medical source statement

form asked Dr. Smith to assess "this individual's ability to do work-related activities in a

normal work setting 8 hours per day, 40 hours per week," tr. at 664, and the ALJ

discounted Dr. Smith's assessments by relying primarily on Plaintiff's ability to perform

basic life activities such as live with others in a recovery house, attend church and group

meetings, do some shopping and "light cleaning," and take public transportation. Id. at

22. Significantly, while the ALJ assumes that Plaintiff's ability to perform basic life

activities on her own schedule equates to the ability to perform consistent and sustained

work, Dr. Smith provided considerable explanations for the limitations he assessed, citing

not only Plaintiff's diagnoses but how they impact her specifically. Id. at 665-69.

Third, although the ALJ was not required to address other enumerated factors such

as length and purpose of the treatment relationship, and specialization, see 20 C.F.R.

§ 416.920c(c), it is worth noting that Dr. Smith is a psychiatrist with longitudinal

familiarity with Plaintiff, and therefore his treatment relationship and specialization

27

strengthen the overall supportability of his opinions compared to those of non-examining

psychologist Dr. Fink.  Dr. Smith oversaw Plaintiff's treatment consisting of therapy and

multiple psychotropic medications, and he assessed Plaintiff's limitations in light of this

treatment history.  Moreover, Dr. Smith did not merely check boxes on his assessment

form, but rather provided explanations to support his assessed limitations, thereby

increasing their persuasiveness.  20 C.F.R. § 416.920c(c)(1).  To the extent the ALJ

believed Dr. Smith's opinions and explanations conflicted with his own treatment notes

regarding the nature and extent of Plaintiff's symptoms, the ALJ could have obtained

clarification.  See S.S.R. 16-3p, "Titles II and XVI: Evaluation of Symptoms in Disability

Claims," 2017 WL 5180304, at *4 (Oct. 25, 2017) ("We may request clarifying

information from an individual's medical sources. . . ."); Corporan v. Comm'r of Soc.

Sec., No. 12-CV-6704, 2015 WL 321832, at *2 (S.D.N.Y. Jan. 23, 2015) ("[D]uty to

develop the record has its roots in the Commissioner's regulatory obligation to ascertain a

claimant's complete medical history before making a disability determination.").

       For these reasons, I find that the ALJ's consideration of the medical opinion

evidence is not supported by substantial evidence.  I will remand for reconsideration of

the opinion evidence, including additional expert medical opinion, if deemed necessary.

              2.       The ALJ's RFC Assessment

       Plaintiff next argues that the ALJ's physical RFC assessment is not supported by

substantial evidence.  Doc. 12 at 10-12; Doc. 18 at 5.  Defendant counters that this aspect

of the ALJ's opinion is supported by substantial evidence.  Doc. 17 at 13-14.

RFC is defined as the most a claimant can still do despite a claimant's physical and mental impairments.  20 C.F.R. § 416.945(a)(1).  With respect to physical limitations, the ALJ found that Plaintiff retained the RFC to perform a limited range of light work, except that she could lift and/or carry twenty pounds occasionally and ten pounds frequently; sit for six hours, stand for six hours, alternate to sitting for ten minutes after every hour of standing, walk for six hours with alternating sitting for every hour of walking; push and/or pull as much as lift/carry; climb ramps and stairs occasionally; never climb ladders, ropes, or scaffolds; rarely tolerate exposure to extreme cold, humidity and wetness, dust, fumes, pulmonary irritants; and occasionally tolerate exposure to extreme cold and extreme heat.  Tr. at 16.  Plaintiff argues that the ALJ's physical RFC assessment is flawed because the ALJ failed to address if Plaintiff would be off-task in an eight-hour workday due to the sit-stand option contained in the RFC assessment, and because the ALJ failed to adequately address Plaintiff's obesity.  Doc. 12 at 10-11.

Because I will remand for reassessment of the medical opinion evidence, which in turn may impact the ALJ's RFC assessment, I do not find it necessary to fully address Plaintiff's arguments.  However, I note that the ALJ's consideration of Plaintiff's obesity is problematic.  First, the ALJ found obesity to be a severe impairment, but then stated, "[t]he undersigned has found [Plaintiff's] obesity to be a "non-severe impairment" insofar as it worsens her symptoms in combination with her other impairments."  Tr. at 13.  Second, the ALJ compounded this inconsistency by stating that he "fully considered" Plaintiff's obesity in assessing her RFC, id., and that he took into account that "[o]besity

29

may have an adverse impact upon co-existing impairments," id. at 15, but then erred in failing to discuss Plaintiff's obesity anywhere in the narrative summary of evidence supporting the RFC assessment, and whether and how her obesity impacted her other impairments.  See Diaz v. Comm'r, 577 F.3d 500, 504 (3d Cir. 2009) ("[A]n ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step."); S.S.R. 02-01p, "Titles II and XVI:  Evaluation of Obesity," 2002 WL 31026506 (Sep. 12, 2002) (obesity considered at each step of the sequential evaluation).  A boilerplate statement with no further discussion does not constitute "meaningful" consideration.  See Muniz v. Astrue, Civ. No. 11-7920, 2012 WL 6609006, at *3 (E.D. Pa. Dec. 19, 2012) ("To 'meaningfully consider the effects,' an ALJ must discuss the evidence and explain his reasoning in such a manner that would be 'sufficient to enable meaningful judicial review.'") (quoting Diaz, 577 F.3d at 504)).

Moreover, the ALJ's failure to provide any meaningful discussion of Plaintiff's obesity impairment cannot be deemed harmless where, as here, obesity exists alongside a pulmonary condition (asthma/COPD) which the ALJ found to be severe.  See Ellis v. Astrue, Civ. No. 09-1212, 2010 WL 1817246, at *5 (E.D. Pa. Apr. 30, 2010) ("An obesity analysis is especially important when the other impairments are musculoskeletal, respiratory, and cardiovascular impairments.").  The record also contains findings such as wheezing and edema, and Plaintiff's testimony and function reports indicating that she has difficulty staying in one spot for long due to leg pain and that she needs help with chores and has difficulty walking because she quickly gets out of breath.  This evidence,

taken together with her severe asthma/COPD and multiple severe mental impairments, strongly suggests that Plaintiff's obesity may impact her symptoms and worsen her limitations beyond the sit-stand option contained in the RFC.[20]  See, e.g., Thorne v. Colvin, Civ. No. 13-2139, 2015 WL 3498642, at *6 (E.D. Pa. June 3, 2015) (ALJ's failure to discuss effect of plaintiff's obesity on her ability to perform work-related functions was harmless where plaintiff failed to point to record evidence that obesity impacted symptoms and plaintiff made no mention of her obesity other than stating her height and weight).  Accordingly, on remand the ALJ shall meaningfully consider Plaintiff's obesity at each step of the sequential evaluation.

3.    Consideration of Plaintiff's Subjective Complaints

Lastly, Plaintiff next argues that the ALJ erred in his assessment of Plaintiff's subjective complaints.  Doc. 12 at 13-15; Doc. 18 at 5-7.  Defendant counters that this aspect of the ALJ's opinion is supported by substantial evidence.  Doc. 17 at 11-13.

With regard to evaluating a claimant's subjective symptoms, the regulations require consideration of all symptoms and the extent to which such symptoms are reasonably consistent with the objective medical and other evidence, including the

---

[20]I note that in considering Plaintiff's mental impairments, the ALJ stated that Plaintiff's "symptom exacerbations tend to parallel life stressors such as bereavement issues, issues with guilt and sadness for family losses sustained while she was incarcerated, housing issues, financial issues, and reunification issues with her children." Tr. at 19.  The ALJ omitted Plaintiff's health issues, which would include her obesity, as a stressor, even though "health issues" were specifically identified as a stressor by Dr. Smith, Plaintiff's treating psychiatrist, in his medical assessment of Plaintiff's mental ability to perform work-related activities.  Id. at 666, 669.  Dr. Smith's opinion in this regard is consistent with S.S.R. 02-01p, 2002 WL 31026506 ("Obesity may also cause or contribute to mental impairments such as depression.").

claimant's statements and descriptions from medical and non-medical sources regarding how the symptoms affect the claimant's activities of daily living and ability to work.  20 C.F.R. § 416.929(a).  The regulations make clear that statements about a claimant's pain or other symptoms cannot alone establish a disability, but instead there must be objective medical evidence from an acceptable medical source that shows the presence of an impairment that could reasonably be expected to produce the symptoms alleged and that, when considered with all the other evidence, would lead to a disability determination.  Id.

Social Security Ruling 16-3p provides guidance about how the Commissioner will evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims.  See S.S.R. 16-3p, 2017 WL 5180304.  The Ruling directs an ALJ to conduct a two-step process to (1) determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms, and (2) evaluate the intensity and persistence of the claimant's symptoms such as pain and determine the extent to which they limit his ability to perform work-related activities.  Id. at *3-5.

Third Circuit case law does not require an ALJ to accept a plaintiff's complaints concerning his symptoms, but rather requires that they be considered.  See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011).  An ALJ may disregard subjective complaints when contrary evidence exists in the record, see Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993), but must explain why he rejects such complaints with references to the medical record.  See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective symptoms must be supported by

objective medical evidence."); Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990) (ALJ may reject claim of disabling pain where he has considered subjective complaints and specified reasons for rejecting claims).  In addition to objective medical evidence, in evaluating the intensity and persistence of pain and other symptoms, the ALJ should consider the claimant's daily activities; location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medications; treatment other than medication; and other measures the claimant uses to address the pain or other symptoms.  20 C.F.R. § 416.929(c)(3).

Here, the ALJ found that Plaintiff had medically determinable impairments that could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the objective medical evidence and treatment history, and with Plaintiff's reported daily activities.  Tr. at 18.  For example, although the record indicated that Plaintiff had "issues with mood and some irritability," the ALJ found that Plaintiff's mental impairments improved with medication and increased contact with her children and that she could live with others in a recovery house, follow house rules, go to stores and to church, take public transportation, engage with others, perform light chores, attend group meetings, and take care of her personal needs.  Id. at 22.

As with Plaintiff's RFC claim, I do not find it necessary to fully address this claim in light of my remand for reassessment of the medical opinion evidence and, if necessary, Plaintiff's RFC.  Nevertheless, some comments regarding the ALJ's consideration of Plaintiff's subjective complaints are warranted.  First, in contrasting Plaintiff's reported

33

symptoms with mostly normal MSE findings, the ALJ largely ignored objective evidence of Plaintiff's fragile mental state, for example noting only one instance of Plaintiff becoming tearful (during the MSE performed by Dr. Schuman, tr. at 21) when the record contains multiple references to Plaintiff's tearfulness and other reactions to stress. See, e.g., id. at 49 (tearful during administrative hearing), 210 (cried when applying for benefits), 357 (11/27/17, reported "frequent crying"), 334 (3/1/18, FPCN treatment note, "tearful" and stressed), 449 (5/10/18, "tearful" during therapy), 450 (same), 537 (8/23/18, Dr. Schuman). It therefore appears that the ALJ overlooked evidence of Plaintiff's instability and fragility, despite undergoing sustained psychotherapy and taking multiple psychotropic medications for four severe mental disorders.

Second, the ALJ improperly emphasized Plaintiff's ability to sustain residence at a halfway house and continued participation in group therapy as evidence that her daily activities were inconsistent with her alleged limitations. To the contrary, as previously noted, Plaintiff's attempts to successfully transition from prison to a halfway house, including group therapy, use of public transportation, and some shopping and church attendance, do not necessarily correlate to an ability to function full-time in a workplace. See Fargnoli v. Massanari, 247 F.3d 34, 41 n.5 (3d Cir. 2001) ("[S]poradic and transitory activities cannot be used to show an ability to engage in substantial gainful activity."); Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) ("disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.")

Therefore, upon remand the ALJ should avoid cherry-picking observations from Plaintiff's mental health treatment record and conflating Plaintiff's post-incarceration transition efforts with the ability to sustain work.

**IV.** **<u>CONCLUSION</u>**

The ALJ failed to properly consider the medical opinion evidence, relying on the opinions of a non-examining psychologist rather than Plaintiff's treating psychiatrist, whose opinions are broadly consistent with, and supported by, the record.  Therefore, I will remand this matter for reconsideration of the opinion evidence, including additional expert medical opinion, if deemed necessary.  On remand, the ALJ is further directed to meaningfully consider Plaintiff's obesity at each step of the sequential evaluation.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DINAH JONES | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  20-5733 |
| Commissioner of Social Security | : | |

# **O R D E R**

AND NOW, this 25th day of May, 2022, upon consideration of Plaintiff's brief and

statement of issues (Doc. 12), Defendant's response (Doc. 17), and Plaintiff's reply (Doc.

18), and after careful consideration of the administrative record (Doc. 11), IT IS

HEREBY ORDERED that:

1.  Judgment is entered REVERSING the decision of the Commissioner of
    Social Security for the purposes of this remand only and the relief sought
    by Plaintiff is GRANTED to the extent that the matter is REMANDED for
    further proceedings consistent with this adjudication; and

2.  The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ ELIZABETH T. HEY

_____

ELIZABETH T. HEY, U.S.M.J.